UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

           Plaintiff,           Criminal No. 17-20489

v.

                               Honorable Terrence G. Berg

D-12 Teeauna White,

           Defendant.

### Government's Sentencing Memorandum

Teeauna White helped her boyfriend Maurice McCoy launder his drug money to bankroll their extravagant lifestyle. McCoy was a significant and successful drug supplier across the U.S. who made huge amounts of cash directing others to distribute his drugs. But without White, McCoy could not enjoy the profits he earned selling drugs. White used business accounts she controlled to conceal and structure McCoy's drug money. She collected bulk cash that couriers delivered to McCoy. In her words, she "ke[pt] a system that shows income u do make." And just like McCoy, she reaped the benefits of his drug sales—purchasing expensive jewelry, multiple high-end vehicles, luxury goods, and a half-million-dollar home.

Besides her money laundering crimes, White has repeatedly exhibited a disrespect for the law. McCoy was a fugitive for months after their indictment was

unsealed. White knew that. But when officers finally arrested McCoy, she was with him in the car before he bailed out of as officers closed in. And during trial White was, at a minimum, inappropriate. White laughed as she participated in social media posts disparaging government counsel and federal agents. And when the jury convicted her, White lashed out. She took to her social media to threaten the witnesses who she blamed for "igniting her indictment." White's sentence should also account for her failure to respect the law, appreciate the seriousness of her offense, or accept responsibility for her illegal actions.

Against this, the Court should consider White's criminal history, her difficult upbringing, and her potential for rehabilitation. A sentence of 84 months—a small variance from the guideline range—would appropriately balance those factors and would be sufficient but not greater than necessary to accomplish the sentencing goals of 18 U.S.C. § 3553.

## Facts

White met McCoy after he already served a significant prison sentence for trafficking drugs. PSR ¶ 87. He was on supervised release at the time. *Id*. ¶ 43. When they met, he was trafficking drugs again. As McCoy admitted at his guilty plea about the drug trafficking organization (DTO) and its operations, he "put everything together." PageID.4939.

White's involvement in McCoy's illegal business was critical to McCoy's

ability to hide his drug money. They used multiple businesses White ran to make their illegitimate profits look legitimate. Almost as soon as McCoy was released from prison for a supervised release violation, he and White opened a joint business bank account for Money Gang Mealclique (MGMC), their record label and promotional company. PSR ¶ 36. At the same time, White independently opened accounts for Another Level (recording studio) and Pretty Pockets (her clothing business). *Id.* Together, White and McCoy used those accounts to launder McCoy's drug money. *Id.* ¶ 15. Pretty Pockets may have existed in some form as White's promotional and clothing business before, but when White opened all the Wells Fargo business accounts in August 2016, she started to use them to conceal McCoy's drug money. In just 14 months, almost a half-million dollars flowed through their business and personal accounts. *Id.* ¶¶ 35-37. At the same time, White admitted their record label wasn't making any money. *Id.* ¶ 48. She also admitted she wasn't working otherwise and hadn't in *at least* a year. *Id.*

MGMC the record label and promotional company and MGMC the DTO were one and the same. They were inextricably intertwined. During the most prosperous period for the DTO, White accrued significant assets—and not from the record label, promotional company, or any other business for that matter. She bought a Bentley worth more than $61,000 in 2015 and paid $9,900 down. *Id.* ¶ 44. She bought a Mercedes Benz worth almost $100,000 in 2017 and paid $15,000

3

down. *Id*. ¶ 45. She made nearly $50,000 in payments for her vehicles. Trial Ex. 61.  White found the home she always wanted but couldn't afford without McCoy's drug money. PSR ¶ 34. But after McCoy went back to prison for not disclosing the purchase of his Porsche, they both knew they couldn't be obviously associated with the purchase of the house, so they used Robin Herndon as their nominee to buy it and pay it off in just six months. *Id*.

White didn't just have flashy cars and an expensive home. She enjoyed extravagant vacations with McCoy, including their trip to Miami when they met with one of the Mexican drug suppliers and yachted for the afternoon.




1

White also visited less glamourous locales—the major drug distribution hubs for McCoy's operation. Just a month before things began to unravel for the DTO, White went to Baltimore and Detroit with McCoy in June 2017 when there was a problem with the money—the drug proceeds. *Id*. ¶ 31. Then in July 2017, DEA raided the DTO's metro Detroit hub—the Novi condo. Besides the 30 kilograms of fentanyl, agents seized more than $500,000 dollars. *Id*. ¶ 18. After the seizure White admitted to her best friend their finances had changed significantly. *Id*. ¶ 48; Trial Ex. 58.6. She also assured others who mistook another "raid" reported on the news shortly after the Novi one that it wasn't McCoy's operation, telling them "We good…You can let everybody know." PSR ¶ 20, Trial Ex. 58.

But that didn't deter White. It was only a month after the raid in Novi that she gifted McCoy a jewel encrusted pinky ring and gave a "shout out to [her] jeweler." Trial Ex. 58.

DEA and IRS's investigation progressed. Agents arrested more DTO members across the country. PSR ¶¶ 23, 26, 28-29. They seized more drugs and proceeds from the DTO, including almost $35,000 from Manjaro Johnson and $140,000 from the Baltimore stash location. *Id*. ¶¶ 25-26. And agents continued to

---

[1] Images from Trial Ex. 59, White's Instagram

identify McCoy and White's assets.

Likely in an effort to distance themselves from the shuttered recording studio and record label, White and McCoy started White Way Trucking in March 2018. *Id*. ¶ 38. McCoy was a listed employee. *Id*. They purchased a truck in January 2019 for $35,510. There is no evidence that McCoy and White used the trucking company to conceal illegal proceeds, but since there is no evidence of legitimate income during this period, it is unclear how they afforded the truck without drug money.

In all, DEA and IRS uncovered White's concealment and spending of drug money, which conservatively included more than one million dollars for which she should be held accountable for. *Id*. ¶ 53.

## Guideline Calculations

Guidelines assessments are governed by a preponderance of the evidence. *McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986); *United States v. Watts*, 519 U.S. 148, 157 (1997). In *McMillan*, the Supreme Court established that unlike an element, a sentencing factor need not be proved beyond a reasonable doubt, and unlike an element or a defense, need not be proved to a jury. *McMillan*, 477 U.S. at 82-92. The district court "is free to make reasonable inferences from facts in the record when fashioning an appropriate sentence." *United States v. Parrish*, 915 F. 3d 1043 (6th Cir. 2019). And the district court may rely on facts recited in the PSR

where the defendant produces no evidence beyond a bare denial of those facts.
*United States v. House*, 872 F.3d 748 (6th Cir. 2017).

> **White's base offense level is correct; she laundered more than $550,000, but less than $1,500,000.**

The Probation Department correctly calculated White's base offense level as 22 pursuant to USSG § 2S1.1. PSR ¶¶ 53, 65. White laundered more than $550,000, but less than $1,500,000. *Id.* White's objections to the inclusion of the full purchase price of the Bentley and Mercedes Benz, (rather than the payments made), and the inclusion of $200,000 in cash deliveries does not alter the base offense level[2].

> **White employed sophisticated means to launder McCoy's drug proceeds.**

The Probation Department appropriately assessed two points pursuant to § 2S1.1(b)(3). Without citing to any authority in her objections, White declares her criminal activity was nothing more than garden variety money laundering. It was

---

[2]  White suggests only counting $46,364.58 in payments for the Bentley. ($61,032.32 Purchase Price - $46,364.58 Payments = $14,667.74 Differential);

White suggests only counting $28,274.45 in payments for the Mercedes Benz. ($96,660.40 Purchase Price - $28,274.45 Payments = $63,385.95 Differential);

($14,667.74 + $63,385.95 = $78,053.69 Differential Total);

($1,279,646.25 Total Amount Attributed - $78,053.69 Differential Total for Vehicles = $1,201,592.56).

more than that. See *United States v. Ramdeo*, 682 F. App'x. 751 (11th Cir. 2017) (it is sufficient for totality of scheme to be sophisticated, even if not every step is sophisticated; totality of fraud scheme which involved series of complex transactions and multiple bank accounts to conceal fraud was sophisticated); *United States v. White*, 850 F.3d 667 (4th Cir. 2017) (same).

White and McCoy used business bank accounts to launder drug proceeds. Almost simultaneously, White independently established accounts for Pretty Pockets and Another Level, and established MGMC with McCoy all with Wells Fargo. These businesses were seemingly legitimate. Pretty Pockets and Money Gang Meal Clique had an online presence, promoting rappers, parties, and branded clothing. In addition to DTO members congregating at Another Level to discuss drug activity and deliver drug proceeds, White and McCoy used the recording studio for legitimate purposes at times. But this was a carefully constructed façade that lent superficial legitimacy to the businesses. IRS Special Agent Ryan Talbot testified that cash-based schemes like this make it easier to conceal drug money, because it is easy to commingle it with legitimate proceeds. In other words, law enforcement can more readily identify money laundering through a purely fictitious company that exists in name only than it can through a sophisticated scheme like White's. See *United States v. Okeke*, 779 F. App'x. 389 (7th Cir. 2019) (defendants employ sophisticated means to engage in concealment money

laundering if they take deliberate steps to make underlying offense difficult to detect; opening business accounts and falsely telling bank that suspicious transactions were from legitimate car sales justified enhancement even if lies were transparent).

Then there is the matter of White's ownership of a half-million-dollar home that she went to great lengths to disguise. White avoided any obvious connection to her residence. She didn't list it on her driver's license. Her multiple vehicles weren't registered there. None of the statements for the multiple bank accounts White controlled were mailed there. Her tax return after she moved in never listed it as her residence.

The purchase and payment of the home alone constituted sophisticated money laundering, all of which was reasonably foreseeable to White. White and McCoy used Herndon as their nominee. See *United States v. Gricco*, 277 F.3d 339, 361 (3d Cir. 2002) (evidence supported sophisticated concealment enhancement due to currency structuring, use of cash to avoid reporting requirements, and the use of family members' names to hide assets). White found the house. She knew what it cost. She kept the payment schedule on her phone. See Trial Ex. 58. After the sale was complete, the keys were delivered to her. To facilitate the downpayment and pay off of the residence, White and McCoy didn't transfer money from their accounts. That would have been too obvious. And the money

didn't just funnel through Herndon's LLC account either. McCoy collected bulk cash from couriers. On occasion couriers saw McCoy turn the cash over to White. White and McCoy withdrew structured cash deposits from the business bank accounts they controlled. Herndon got cash to pay off the house—cash that was deposited into various accounts and transferred to Herndon to layer through the financial system. When charted in trial exhibits, it showed the sophistication of the scheme. See *United States v. Bienzigha*, 744 F. App'x. 233 (5th Cir. 2018) (enhancement was based on scheme to conceal the proceeds by using third parties, fictitious accounts, and two or more levels (i.e., layering) of transactions).





**White is not deserving of a mitigating role adjustment.**

It is White's burden to show she played a minor role in the money

laundering conspiracy. *United States v. Rodriguez*, 896 F.2d 1031 (6th Cir. 1990)

(the defendant has the burden of proof for facts supporting a mitigating factor). She

cannot meet it. A mitigating role is reserved only for defendants who are

"*substantially less culpable* than the average participant in the [laundering of

funds].” USSG § 3B1.2, comment. (n.3(A)); See also *United States v. Lloyd*, 10 F.3d 1197 (6th Cir. 1993). The facts and the law do not support White’s position.

White played an indispensable role in laundering McCoy’s drug proceeds. And the Sixth Circuit has consistently held that someone who has a vital role in a conspiracy is not entitled to a mitigating role reduction. See *United States v. Skinner*, 690 F.3d 772 (6th Cir. 2012) (no mitigating role reduction where role as courier was critical to success of conspiracy). In *Skinner*, the court upheld the denial of the adjustment to a courier of drugs proceeds for a larger organization someone else ran. In upholding the district court, the Sixth Circuit relied on United *States v. Sheafe*, 69 Fed.Appx 268 (6th Cir. 2003). In *Sheafe*, the court noted “[a] defendant does not qualify for a mitigating role reduction merely because someone else planned the scheme and made all the arrangements.” *Id*. at 270. See also *United States v. Owusu*, 199 F.3d 329 (6th Cir. 2000) (defendant denied mitigating role who was less culpable than the primary conspirators, but not less than the average one). Similarly, here, the Court should reject White’s argument that she qualifies for a minor role because it was McCoy’s drug money, he was the one calling the shots, and directing others. She set up the accounts, she recruited other participants, and she benefited directly. Similarly, White’s claim that she was only involved in the legitimate aspects of the businesses is directly contradicted by the evidence and the jury’s guilty verdict.

The applicability of the adjustment is a fact-based determination, and the guidelines provide a non-exhaustive list of factors to consider. See USSG § 3B1.2, comment. (n.3(C)). White's involvement, particularly as the sole signor on several of the business bank accounts that were used to launder drug money was essential to the conspiracy. White was the only one who could access the drug money deposited into Another Level and the Pretty Pockets accounts. And only she and McCoy could access all the money in MGMC's account. Given her exclusive control over the accounts and knowledge about the financial scheme used to conceal the drug money, White was not a minor participant. USSG § 3B1.2, comment. (n.3(A)).

White also recruited others to help launder drug proceeds. She sought out people with Wells Fargo bank accounts to structure deposits in Baltimore. PSR ¶ 39. The day before DTO members structured deposits of almost $60,000 of drug money in Baltimore, White exchanged messages with her sister that she needed "Wells [Fargo accounts]" but didn't "want to text to much feel me" (sic) when her sister offered "Chase [accounts]." *Id.*, Trial Exs. 62.1, 58. Recruiting accomplices is a factor to consider in the application of an aggravated role. See USSG § 3B1.1, comment. (n.4). Not only that, but White involved the same sister and sister's friend in the conspiracy, using them to deliver drug proceeds from one of the DTO's distribution cities. White purchased tickets for her sister and her friend to

14

fly from Detroit in coordination with DTO member Manjaro Johnson. White ensured her sister was returning with drug money when she inquired "Y'all got the bread on y'all" when discussing whether to deliver the cash to the recording studio or her residence. PSR ¶ 32, Trial Ex. 58. While the government is not advocating for an aggravated role, White's recruitment of accomplices strongly undermines her argument she was a minor participant in the agreement to launder drug proceeds. White's behavior in each instance—also considered in conjunction with her accessing the note on her phone with details of the accounts used to structure the Baltimore deposits—is evidence of White's integral involvement in the planning and organizing of the criminal activity. See USSG § 3B1.2, comment. (n.3(C)(ii)).

Beyond this, the people who stood to benefit the most from the criminal scheme were McCoy and White. *Id*., comment. (n.3(C)(v)). All the money flowed to them. DTO members who transported drugs, cash, or structured deposits weren't making a windfall of cash. They were paid minimally per trip. Even McCoy's distributors, who profited more than the couriers, didn't live lavishly like McCoy and White. They didn't have multiple luxury vehicles. No one else resided in a luxury home. And if they sported one of the gold and diamond encrusted MGMC pendants like McCoy and White's, it was because McCoy gave it to them. White had a proprietary interest in the criminal activity. She wasn't simply paid to

perform certain tasks—and those are the people who should be considered for the guideline adjustment. *Id*.

White's guidelines should account for the sophisticated means she used to launder funds. And she should not be deemed a minor participant in the money laundering conspiracy. Probation correctly scored her guideline range to be 97-121 months. PSR ¶ 115.

## Sentencing Factors

The Court's sentence needs to reflect the seriousness of the offense. § 3553(a)(2)(A).

Money launderers are an essential, but often unseen, part of the drug trade. Their relative anonymity allows money launderers to profit handsomely from the drug business, while avoiding the more significant risks of drug dealing. Accordingly, money laundering defendants need to be punished commensurately with the importance of their role in drug trafficking. White wasn't a mere courier transporting bulk cash. Rather, she collected the cash from couriers who took the risk of transporting money cross-country. And she used sophisticated means to try to disguise her criminal activity.

White used multiple businesses and bank accounts to try to legitimize the hundreds of thousands of dollars of drug money she and McCoy funneled through them.

White admitted neither the "label & music" made any money.



But in the same exchange she also admitted she helped try to legitimize McCoy's businesses by "[k]eeping a system that shows income u do make." White wasn't merely complicit in the laundering of McCoy's drug money; she was integrally involved.



Of the 18 defendants charged in this case, McCoy and White were the only to get rich. No one else lived as lavishly. And White was materialistic, bragging on social media about their cars, vacations, and jewelry. The images offered at trial and herein are merely representative of White's multiple posts.

 

White posted an image of her Bentley and Mercedes and McCoy's Porsche identifying them with hashtags and the caption "Inny Minny Miney Moe Which Gas pedal will I smash to the Floe."

---

[3] White's prettyp0ckets100 Instagram post from 3/19/20 captioned "Locced In."
[4] White's wear_prettypockets Instagram post from 3/19/20 with McCoy and well-known jeweler Iceman Nick.



**Text** Inny Minny Miney Moe 🚗🚗 Which Gas pedal will I smash to the Floe 🏎🏎🏎🏎♀ #BentleyGt #MercedesGLE #AMG #porshepanamera




---

[5] Trial Ex. 59
[6] White's prettyp0ckets100 Instagram post in front of her Mercedes Benz wearing Louis Vuitton accessories.
[7] White's wear_prettypockets Instagram post on the hood of her Mercedes Benz.

The Court needs to promote respect for the law. § 3553(a)(2)(A). It also needs to consider the characteristics of the defendant. § 3553(a)(1). And White has repeatedly flouted the law.

White met McCoy after he served his first prison sentence for trafficking drugs. PSR ¶ 87. And while she was expecting their child, McCoy went back to prison for purchasing a Porsche. White and McCoy knew luxury assets like the Porsche garnered the attention of McCoy's probation officer—and ultimately landed him back in prison. That's why White and McCoy went to such great lengths to hide their assets by using Herndon to purchase and pay off their Pala Loma residence. White was complicit in the deceit, telling McCoy in a June 22, 2017, text message "I made sure u po haven't came to the house." *Id*. ¶ 49.

In June 2019, when officers searched McCoy and White's Pala Loma residence they also had a seizure warrant for White's Bentley. It wasn't at the house at the time and agents continued to try to locate the vehicle. But after the search of her residence, White rushed to sell the vehicle. *Id*. ¶ 44.

When agents arrested White, she appeared in court in California and received a copy of her indicment. *Id*. ¶ 3. She knew McCoy was charged. ECF No. 199. McCoy eluded law enforcment that morning. He left their Pala Loma residence, abandoned the children there, shut off his phone, and never reported to his scheduled appointment with his probation officer. PSR ¶ 52. For months while

White was on bond, McCoy was a fugitive who law enforcement actively sought to arrest. And when they tracked McCoy down, White was with him. *Id.*

White also knew that Tyler Jackson, who she has described as family, was also charged. PageID.3481. Jackson too was a fugitive. But the day after McCoy's arrest, White communicated with Jackson extensively, likely to warn him, which helped him continue to evade arrest. PageID.2123. It took two more months for U.S. Marshals to track Jackson down.  PSR ¶ 29. White continued to communicate with Jackson while he was a fugitive. PageID.2123.

At trial, White continued to exhibit disrespect for the law. During a break in testimony, White directed inappropriate comments at government counsel about the examination. White wanted to know if counsel planned to ask the agent about his alleged "interrogation" of her unattended minor children in her home. And as the Court is aware, on the last day of trial, before the verdict, White laughed as she participated in social media posts disparaging the same trial counsel, accusing her of "playing with [White]" and her sister declaring "fu** [trial AUSA], fu** the feds, fu** DEA, fu** Detroit." See Gov. Sealed Exhibits 5-6 to ECF No. 724.

After the verdict, White took to social media to threaten trial witnesses. In one story she posted, White listed her case number and named the testifying witnesses with a rat emoji next to their names. She even went so far as to list the city and state where she presumed one witness, who was not in custody, resided.

She made clear the witnesses she named weren't the only cooperators, just the ones who testified.  PSR ¶ 11. In another story, White posted an image of one of the witnesses who she blamed for "igniting" her indictment and referenced their pending sentence. *Id*. White mentioned the witnesses family members as encouraging their cooperation. *Id*. When this Court revoked White's bond for her posts, it found she failed to appreciate the seriousness of her offense and that her messages were clearly threatening, conveying "that the people who cooperated against her…deserve to be hurt or punished for doing so." PageID.9194. While White's retaliatory actions were not a basis to score additional points for obstruction of justice, collectively, her behavior is a reason not to further vary from the government's recommendation.

White's touted record of compliance until the jury's verdict is unmoving. Had the government not discovered White's and her sister's social media posts she would have undoubtedly stood before the Court at sentencing and lied, claiming she never violated her bond conditions. The reality is she didn't have many restrictions, which meant she was less likely to violate. And defendants are expected to comply with their bond conditions, which White ultimately failed to do in the most egregious way.

White's childhood was troubled and she was subject to abuse. Her parents weren't reliable because they abused drugs. PSR ¶¶ 81-83. Unfortunately, that was

the case with many if not all of the defendants here. To her credit, White does not have any prior convictions. *Id*. ¶ 76. The guidelines, however, already account for her lack of criminal history. In fact, she received a further reduction as a zero point offender pursuant to § 4C1.1. *Id*. ¶ 74. In other words, there is no reason to vary from the guidelines based on her lack of criminal history.

The Court should avoid unwarranted sentencing disparities among defendants with similar records who are found guilty of similar conduct; §3553(a)(6). As a general matter, the sentencing guideline range helps guide courts in fashioning sentences that will avoid these unwarranted disparities, 18 U.S.C. § 3553(a)(6), because "[t]he Guidelines exist to help ensure that similarly-situated defendants are punished similarly." *United States v. Vassar*, 346 Fed.Appx. 17, 29 (6th Cir. 2009) (citing *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir.2006)). This provision of the guidelines is primarily aimed at national disparities, rather than those between co-defendants. *United States v. Rivera-Gonzalez*, 626 F.3d 639, 648, (1st Cir. 2010). However, Courts "may exercise…discretion and determine a defendant's sentence in light of a co-defendant's sentence." *United States v Presley*, 547 F3d 625, 631 (6th Cir 2008).

According to the Judiciary Sentencing Information platform (JSIN) the average sentence for defendants who committed similar conduct and who also lacked a criminal history was 80 months; the median sentence was 87 months. PSR

¶ 140.

People who distribute drugs at McCoy's level do it for one reason—mass profit. And no one benefited as much as McCoy and White. They used the profits to fund their lifestyle without regard for the harm the drugs McCoy distributed caused communities and vulnerable users. White's substantial benefit from the drug and money laundering scheme calls for a signficant sentence. And it's even more shameful knowing White knew first hand the negative impact of drug addiction from her parents' struggles. PSR ¶ 81. And lastly, no one else exuded the disprespect for the law and criminal justice system that White did. She didn't care that McCoy was a fugitive. She continued to associate with him regardless. She mocked the criminal justice system when she participated in disparaging comments against named government counsel and law enforcement on public social media posts. And she outright threatened witnesses who she blamed for her conviction rather than accepting responsibility for her criminal behavior.

### Government's Request

A sentence of 84 months accounts for the seriousness of White's offense, vital role in the criminal scheme, and lack of respect for the law, while balancing her lack of criminal history and other mitigating arguments, and considering the relative sentences the Court has imposed.  This sentence is sufficient but not greater than necessary to achieve the statutory objectives of § 3553(a).

## Conclusion

The Court should sentence White to 84 months in prison.

Respectfully submitted,

Dawn N. Ison
United States Attorney

*s/ Andrea Hutting*
Andrea Hutting
Craig F. Wininger
Gjon Juncaj
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI 48226
313-226-9110 phone
andrea.hutting@usdoj.gov

Dated: December 13, 2023

**Certificate of Service**

I hereby certify that on December 13, 2023, filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney of record.

*s/Andrea Hutting*
Andrea Hutting
Assistant United States Attorney